UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; and ALLSTATE NORTH AMERICAN INSURANCE COMPANY,<br><br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>ATLAS MEDICAL AND ORTHOPEDICS, LLC; DR. RAHAT FADERANI, DO, MPH, PA; and M. RAHAT FADERANI, D.O.,<br><br>　　　　　　　　Defendants. | Civil Action No. _____<br><br><br>**Demand for Jury Trial** |

## **COMPLAINT**

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate North American Insurance Company (collectively, "Allstate" and/or "plaintiffs") hereby allege as follows.

## I.　**INTRODUCTION**

1.　This is a case about pain management clinics and their owner who engaged in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent records, bills, and invoices through the U.S. Mail, emails, and faxes sent over state lines seeking to collect payment from Allstate for medical services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants.

3.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

4.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), FLA. STAT. §§ 501.201-501.213; (3) common law fraud; (4) civil conspiracy; and (5) unjust enrichment.  Allstate also seeks declaratory relief that no previously-denied and pending insurance claims submitted to it by and on behalf of the defendants are compensable.

5.     As a result of the defendants' fraudulent acts, Allstate has paid millions of dollars to resolve insurance claims that were based on the false, fabricated, unlawful, and improper medical services at issue in this Complaint.

## II.    THE PARTIES

### A.    PLAINTIFFS

6.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate North American Insurance Company are each duly organized and existing under the laws of the State of Illinois.

7.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate North American Insurance Company each have their respective principal places of business in Northbrook, Illinois.

8.      At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Florida.

B.    **DEFENDANTS**

      1.      **Atlas Medical and Orthopedics, LLC**

9.      Defendant Atlas Medical and Orthopedics, LLC ("Atlas Medical") is organized under the laws of the State of Florida.

10.      Atlas Medical's member is defendant M. Rahat Faderani, D.O. ("Faderani"), who is a resident and citizen of Florida.

11.      At all relevant times, Atlas Medical was operated and conducted by defendants Dr. Rahat Faderani, DO, MPH, PA ("Faderani PA") and Faderani.

12.      Atlas Medical billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and that were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 1.

      2.      **Dr. Rahat Faderani, DO, MPH, PA**

13.      Defendant Dr. Rahat Faderani, DO, MPH, PA is organized under the laws of the State of Florida.

14.      Faderani PA's member is defendant Faderani, who is a resident and citizen of Florida.

15.      At all relevant times, Faderani PA operated and conducted defendant Atlas Medical.

16.      Faderani PA billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and that were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 1.

### 3. M. Rahat Faderani, D.O.

17.     Defendant M. Rahat Faderani, D.O. is a resident and citizen of the State of Florida.

18.     At all times relevant to this Complaint, Faderani owned and controlled defendants Atlas Medical and Faderani PA.

## III.    JURISDICTION AND VENUE

19.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

20.     Pursuant to 28 U.S.C. § 1332, this Court also has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

21.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

22.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the vast majority of the acts at issue in this Complaint were carried out within the Southern District of Florida.

## IV.    BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

23.     The defendants used Atlas Medical to submit exorbitant charges to Allstate for purported medical services, procedures, and testing that were not actually provided, were unlawful, were not medically necessary, and were fraudulently billed.

24.     Atlas Medical and Faderani PA are organized as separate legal entities, but the defendants used their names and taxpayer identification numbers interchangeably to generate and submit bills to Allstate for non-compensable claimed medical services.

4

25.     Bills submitted using Faderani PA's taxpayer identification number used the Atlas Medical name, evidencing that the defendants operated Atlas Medical and Faderani PA as a single RICO enterprise that will hereinafter be referred to singularly as Atlas Medical unless expressly noted otherwise.

26.     As detailed above, defendant Faderani is the sole member of both Atlas Medical and Faderani PA.

27.     In July 2012, the Florida Department of Health filed an administrative complaint against Faderani alleging, *inter alia*, that he prescribed inappropriate and excessive amounts of narcotics and habit-forming drugs to numerous patients.  *See* Dept. of Health v. M. Rahat Faderani, D.O., Administrative Complaint, Case No. 2010-22214.

28.     The administrative complaint further alleged that Faderani failed to conduct appropriate physical examinations and failed to order diagnostic studies of patients.  Id.

29.     As a result of the administrative complaint, Faderani entered into a settlement agreement that placed two permanent practice restrictions on his medical license:

(a)     Faderani shall not own, operate, or work in a Pain Management Clinic ("PMC"), as defined by section 459.0137, Florida Statutes, nor be a designated physician of a PMC or apply with the Department of Health for a registration of a Pain Management Facility; and

(b)     Faderani is permanently prohibited from prescribing or dispensing any controlled substance as defined by Chapter 893, Florida Statutes.

*See* Dept. Of Health v. M. Rahat Faderani, D.O., Final Order Accepting Settlement Agreement, Case No. 2010-22214.

30.     A "pain management clinic" is defined as "any publicly or privately owned facility . . . that advertises in any medium for *any type of pain-management services*[.]"  FLA. STAT. § 459.0137(1)(a)(1)(c) (emphasis added).

31.     During all times relevant to this Complaint, Faderani owned and operated Atlas Medical and Faderani PA, which both operated as pain management clinics in violation of Faderani's permanent license restrictions.

32.     Therefore, all amounts billed by the defendants to Allstate for the entire period at issue in this Complaint were unlawful.

33.     Not only were the services billed by the defendants unlawful (and therefore not compensable, as detailed below), they were excessive, inappropriate, improperly billed, and designed to generate charges rather than for legitimate patient care.

34.     These services were often ordered in the absence of physical examinations and based on non-existent or fabricated diagnostic studies, which is the same conduct for which Faderani was sanctioned by the Florida Department of Health.

35.     The patients at issue herein were seeking little or no medical treatment on their own before they were steered to Atlas Medical in order to bolster the perceived value of their insurance claims.

36.     Once patients were directed to Atlas Medical, they were immediately recommended invasive, unsupported, and improper pain management injections that were often billed by the defendants on the same date as purported initial evaluations.

37.     The defendants nearly always directed patients to return for a second round of procedures, but rarely followed up with patients thereafter, as the point of the RICO enterprise was

to quickly generate significant medical bills through pain management procedures and not to provide legitimate ongoing care.

38.     Many of the bills and records at issue in this Complaint were mailed, faxed, and emailed directly to Allstate by the defendants in order to induce payment of first-party medical benefits pursuant to the Florida Motor Vehicle No-Fault Law, FLA. STAT. § 627.730, *et seq*.

39.     However, the majority of the defendants' bills were presented to Allstate for the first time by the defendants' law firm associates as part of demands seeking all or nearly all of the limits of coverage provided by Allstate's insurance policies.

40.     Because Allstate and its insureds could face substantial liability for rejecting a demand, the defendants and their associates knew that they would induce Allstate to make substantial payments without the opportunity to conduct meaningful investigation to discover the fraud discussed herein.

41.     The defendants' fraudulent bills and records were designed to be, and in fact were, a substantial factor inducing Allstate to make payments that it would not have but for the fraudulent bills by the defendants.

42.     The defendants were at all times aware that the personal injury attorneys to whom they sent their bills and records would in turn mail, fax, and email them to Allstate to demand insurance payments, and that proceeds of such insurance payments would be mailed to the personal injury attorneys and disbursed for the financial benefit of the defendants.

43.     Absent the fraudulent bills from the defendants and their associates, the bills transmitted to Allstate would have documented minimal treatment and medical expenses that totaled far less than policy limits.

44.     Upon information and belief, the defendants expected and arranged to be compensated by their personal injury attorney associates at rates that were far less than the amounts represented to be their charge amounts in the records and bills mailed, faxed, and emailed to Allstate.

45.     The defendants were aware that Allstate would rely, and Allstate did in fact rely, on their bills and records in adjusting and paying insurance claims.

## V.      BILLING FOR SERVICES NOT RENDERED

46.     The defendants regularly billed for services, treatment, and testing that were never rendered to the patients at issue herein.

47.     Many of the bills generated by the defendants for services not performed were the result of their standard practices that were repeated for numerous patients.

### A.      INJECTIONS AND PROCEDURES NOT PERFORMED

48.     Atlas Medical routinely billed for injections and other procedures not actually provided to patients by adding charges for more disc and facet joint levels than were actually treated (if any injections or procedures were performed at all).

49.     When billing for spinal injections and procedures such as epidural steroid injections ("ESIs"), facet injections/medial branch blocks ("MBBs"), and radiofrequency ablations ("RFAs"), a provider may only bill for the number of units that correspond with the number of discs or facet joints actually treated.

50.     Atlas Medical disregarded this obvious requirement and routinely billed for injecting more vertebral levels than were actually treated.

51.     A disc is located between vertebra of the spine and is referred to with reference to the vertebra both above and below the disc.  For example, a reference to the disc at L4-5 is a reference to a single disc and an injection to the disc at L4-5 is a single injection.

52.     Similarly, a facet joint is located in the space between the bones of the spinal column, such that a two-level MBB or RFA would be identified with reference to three (3) vertebral levels.

53.     Further, medial branch nerves are located above and below the facet joint.  If the medial branch nerves are targeted for injections, then the nerves are injected above and below the facet joint and although two nerve branches receive injections, this still constitutes just a single unit.

54.     Atlas Medical regularly billed for more levels of these procedures than disc levels and facet joints actually addressed.

55.     As just one example of this routine practice with respect to MBBs, Atlas Medical billed Allstate for an alleged three-level lumbar MBB on March 24, 2023 to A.H. (Claim No. 0754516425)[1] on June 4, 2024.

56.     The injections, if performed at all, were to the L3-4 and L4-5 levels of A.H.'s spine, meaning that at most only two (2) joints were actually treated and at least one (1) level billed by Atlas Medical was for a service not performed at all.

57.     Similarly, and as just one example of this routine practice with respect to ESIs, Atlas Medical billed Allstate for three (3) levels of alleged transforaminal ESIs to D.N. (Claim No. 0747379063) on April 9, 2024, despite injecting at most just two (2) levels at L4-5 and L5-S1.

---

[1] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and Allstate claim number.  The defendants are aware of the Allstate claim number as the defendants included the claim number on bills submitted to Allstate.

58.     In many cases, the defendants attempted to conceal their improper billing for more injections than were actually performed by misusing the Current Procedural Terminology ("CPT") codes that describe the procedures.

59.     For MBBs, there exist CPT codes for first, second, and third levels of injection in both the cervico-thoracic spine (CPT codes 64490, 64491, and 64492) and lumbo-sacral spine (CPT codes 64493, 64494, and 64495).

60.     Rather than use the proper CPT code for a third level when such injections were performed, Atlas Medical billed two (2) units that describe the second level of injections.

61.     For example, on July 11, 2024, Atlas Medical billed for six (6) levels of MBBs to J.M. (Claim No. 0752334508) despite performing, at most, four (4) MBBs to her C5-6, C6-7, L4-5, and L5-S1 levels.

62.     Rather than use CPT codes 64492 and 64495, which describe the third level of injections in the cervico-thoracic and lumbo-sacral spines, respectively, Atlas Medical instead billed two (2) units of 64491 and 64494 in an attempt to conceal that it billed for more services than were actually performed.

63.     Atlas Medical then went on to bill for six (6) RFAs to J.M. on July 25, 2024, despite administering this procedure (if at all) to the same four (4) spinal levels as the MBBs, billing again for at least two (2) entire levels that were not done at all.

64.     Similarly, on May 16, 2024, Atlas Medical billed for alleged MBBs to the same four (4) spinal levels to A.M. (Claim No. 0751954512) as it had to J.M., and again falsely billed for treating six (6) levels using the same improper CPT codes.

65.     Not only did the defendants routinely bill for more levels of injections and radiofrequency ablations than were actually performed, they also billed for entire procedures that did not occur at all.

66.     For example, on April 2, 2024, the defendants billed Allstate over $43,000 for six (6) levels of alleged RFAs to S.P. (Claim No. 0737025833).

67.     When asked about this extensive procedure during testimony, S.P. responded as follows:

> Q.     Did Dr. Faderani ever tell you he was going to do a procedure where he was going to burn the nerves in your neck and back?
> A.     God, I hope not. No.
> Q.     Have you ever had that discussion with him?
> A.     If he said that, that would have been so alien to, you know, anything that I would have done.
> . . .
> Q.     So as far as you, that did not happen, ma'am?
> A.     . . . no way was anyone ever going to do that to me . . . I would have said no.

68.     The defendants also billed for alleged ESIs that would have been nearly impossible and extremely dangerous to perform in the manner described by their records.

69.     Specifically, Atlas Medical billed for allegedly performing cervical transforaminal ESIs to patients lying in the prone position.

70.     In the prone position, patients lie face down on a flat surface.  Most ESIs are delivered with the patient in this position because it allows the physician access to the patient's spine.

71.     A cervical transforaminal injection, however, uses an anterior approach to place the needle at the nerve root of the patient's vertebra.  If the patient is prone, the boney structure of the vertebrae obscures the needle's approach making it impossible to visualize proper placement.  For that reason, this particular ESI is administered with patients in a supine position.

72.     If the defendants actually performed these injections in the prone position, contrary to standards of care and in reckless disregard for patient safety, they did so without properly visualizing needle placement near the patient's spinal column.

73.     The danger caused by the defendants' alleged approach for these procedures is compounded by the fact that they claimed to use the particulate steroid triamcinolone for these injections.

74.     Particulate steroids like triamcinolone are not appropriate for ESIs because they can result in stroke and death if they embolize to an artery.

75.     The placement of the needle during a cervical transforaminal ESI is exceedingly close to the vertebral artery, as well as feeding arteries to the spinal cord, the spinal segmental artery, and the radicular artery.

76.     If the particulate steroids the defendants claimed to inject embolized to any of these three arteries, it could cause a stroke, and if the defendants could not properly visualize placing the needle because patients were improperly in the prone position, the risk was greatly magnified.

77.     That no patients at issue in this Complaint appear to have been severely injured or killed by the defendants is alone evidence that these injections were not performed as billed.

78.     As one representative example of cervical transforaminal injections claimed to have been performed in just this way, on January 20, 2022, a bill was submitted by Atlas Medical claiming that G.H. (Claim No. 0642463350) was administered a transforaminal injection of the particulate steroid triamcinolone at the C5-6 level while in the prone position.

79.     On rare occasions, Atlas Medical billed for trigger point injections ("TPIs") instead of MBBs or ESIs.

80.     Although these are injections into muscles rather than joints, Atlas Medical still billed for services not rendered.

81.     There are two (2) CPT codes that can be used to bill for TPIs: 20552, which is for performance of injections into one (1) or two (2) muscles, and 20553, which is for performance of injections into three (3) or more muscles.

82.     Atlas Medical billed using CPT code 20553 even when it performed no more than two (2) injections.

83.     For example, on January 4, 2024, Atlas Medical billed for an alleged TPI to R.D. (Claim No. 0730662269) that was described as a singular injection in the lower back area.

84.     Even if it were assumed that this was a bilateral procedure, which is not documented, it was at most two (2) injections.

85.     Atlas Medical nevertheless claimed that it administered three (3) injections, and billed a higher amount, by using CPT code 20553 on its bill.

86.     The exemplars set forth in this section are representative of improper and fraudulent billing practices that the defendants regularly used with respect to purported injections to the patients at issue herein and Allstate has no obligation to pay for bills for services that were not performed and is entitled to restitution for every payment it was induced to make and every cost that it incurred due to false and fraudulent claims about services that were not actually provided.

   **B.     EVALUATIONS NOT PERFORMED**

87.     Atlas Medical regularly billed for patient examinations that were claimed to be the most complex patient encounters possible even though such purported examinations resulted in recommendations for nearly identical treatments for almost every patient at issue herein.

88.     As part of Atlas Medical's predetermined protocol detailed below, patients were typically immediately administered MBBs on the same date as purported high complexity initial evaluations and directed to return to the clinic within weeks for improper and unnecessary administration of RFAs.

89.     When patients returned to Atlas Medical for these pre-planned RFAs, Atlas Medical improperly billed for alleged level 5 patient re-evaluations, which is the most complex and expensive level of examination that is possible to bill.

90.     It is never appropriate to bill separately for examinations in conjunction with planned procedures as examining a patient is considered an included component of the procedure service.

91.     Atlas Medical's practice of billing for such evaluations would have violated clear coding guidelines if evaluations were actually performed, but Atlas Medical did not even perform any examinations at all in these circumstances, much less the most detailed examinations with the most highly complex medical decision making possible.

92.     As one representative example of this routine practice, on August 16, 2024, Atlas Medical billed for a level 5 re-evaluation of J.R. (Claim No. 0753692052) just four (4) days after billing for a level 4 initial evaluation of J.R.

93.     The second purported evaluation of J.R. was billed because J.R. allegedly presented to the clinic for improper and unnecessary RFAs.

94.     Atlas Medical did not record any medical history, did not perform any physical examination, and did not even evaluate how J.R. responded to the MBBs that had been billed days prior (and which were expressly done to determine whether the RFAs would be medically reasonable), and therefore did not perform any evaluation that would constitute a billable service.

14

95.     Atlas Medical also billed for other services in conjunction with patient evaluations that were not performed at all.

96.     One purported service frequently billed by Atlas Medical was alleged self-care education and management using CPT code 97535.

97.     This is a timed service that requires fifteen (15) minutes of one-on-one treatment and involves addressing unique and specific issues relevant to patients' living environments and activities of daily living.

98.     Atlas Medical consistently failed to document that it spent enough time to bill for the service and used only boilerplate language describing purported instructions that were not unique and patient-specific such that it is not possible that any billable service was actually performed.

99.     For example, Atlas Medical billed Allstate for alleged self-care education and management on August 9, 2022 to O.K. (Claim No. 0670256338) but did not address anything pertaining to activities of daily living.

100.    Similarly, Atlas Medical billed Allstate for alleged self-care education and management on March 24, 2022 to J.A. (Claim No. 0575150065) but at most provided basic and obvious advice (such as to avoid heavy lifting) and did not address any unique requirements.

101.    Another service frequently billed by the defendants in conjunction with patient evaluations was range of motion ("ROM") testing.

102.    ROM testing is a standard component of a physical examination and is not separately and additionally billable except in unique circumstances when it is performed as a standalone procedure.

103.    Nevertheless, the defendants frequently billed for both a patient examination and ROM testing on the same date, and billed for ROM testing when it was not actually performed.

104.    Atlas Medical used CPT code 95851 to bill for purported ROM testing, which requires that every joint and plane of motion in the subject body part be tested and the results be recorded for use in the creation of a treatment plan.

105.    Atlas Medical did not come close to meeting this requirement as it frequently billed for ROM testing without attempting to address the entire range of the subject body part, without recording the results for a treatment plan, and often without documenting that any testing was done at all.

106.    For example, Atlas Medical submitted bills for an alleged initial evaluation of R.P. (Claim No. 0736182064) on February 13, 2024, and included a separate and additional charge for ROM testing.

107.    Atlas Medical did not record what body part(s) R.P. claimed of pain, did not purport to test any spinal ROM, and stated only that several planes of motion in extremities were within normal limits.

108.    It is not clear what body part Atlas Medical believes it could separately bill for testing, but none of the areas mentioned qualified for billing at all.

109.    Further, the purported findings were not recorded and used to formulate a treatment plan as no treatment plan was developed for R.P. at all.

C.    EPIDUROGRAPHIES NOT PERFORMED

110.    For many purported injections, Atlas Medical submitted separate charges for alleged epidurographies that did not take place.

111.    An epidurography is a diagnostic test that is used in the absence of other high-quality imaging and, according to billing guidelines, may only be reported when it is reasonable and medically necessary to perform a diagnostic study.

112.    Epidurographies differ from fluoroscopic guidance, which is a typical and non-billable service used to guide the types of injections that constitute Atlas Medical's predetermined treatment protocol, because they require a formal report and interpretation.

113.    Epidurographies may not be billed when the contrast injection is part of the fluoroscopic guidance (which also cannot be separately billed in accordance with billing guidelines, discussed below) to confirm correct needle placement.

114.    To bill for medically necessary epidurographies, the provider must actually take and save images and provide a radiology report describing the results, which was never done by Atlas Medical, meaning that epidurographies were never performed.

115.    As one example, on January 11, 2024, Atlas Medical billed Allstate for an epidurography to G.M. (Claim No. 0692849151) even though the contrast agent was expressly used to confirm needle placement and was therefore nothing more than unbillable fluoroscopic guidance: "1cc of omniflow was injected to confirm placement by monitoring for contrast pattern in real time fluoroscopy."

116.    In another example, Atlas Medical billed Allstate on September 19, 2023 for an alleged epidurography to E.C. (Claim No. 0710204512) but rather than a radiology report as required, Faderani merely stated, "I took care to avoid taking too many pictures to avoid radiation exposure," which is a comment repeated with respect to numerous patients at issue herein.

117.    As with injections and evaluations not performed, all bills containing charges for epidurographies that were not performed were fraudulent and non-compensable and Allstate is

entitled to damages for all costs incurred as a result of the submission of such bills, including but not limited to payments made for services that were not performed.

## VI.    **UNLAWFUL SERVICES**

118.    Allstate is not required to pay a claim or charges for any service or treatment that was not lawful at the time rendered.  *See* FLA. STAT. § 627.736(5)(b)(1).

119.    Faderani owns, operates, and works in a pain management clinic as defined by Florida law in violation of the Florida Department of Health Final Order Accepting Settlement Agreement, dated June 3, 2013, Case No. 2010-22214.

120.    Thus, all the services billed by the defendants for the period at issue in this Complaint were unlawful because Faderani was and is permanently prohibited from owning, operating, or working in a pain management clinic.

121.    As discussed above, Faderani's settlement agreement with the Florida Department of Health placed two permanent practice restrictions on Faderani's medical license:

(1)    Faderani shall not own, operate, or work in a Pain Management Clinic ("PMC"), as defined by section 459.0137, Florida Statutes, nor be a designated physician of a PMC or apply with the Department of Health for a registration of a Pain Management Facility; and

(2)    Faderani is permanently prohibited from prescribing or dispensing any controlled substance as defined by Chapter 893, Florida Statutes.

*See* Dept. Of Health v. M. Rahat Faderani, D.O., Final Order Accepting Settlement Agreement, Case No. 2010-22214.

122.    A "pain management clinic" is defined in relevant part as "any publicly or privately owned facility . . . that advertises in any medium for any type of pain-management services[.]" FLA. STAT. § 459.0137(1)(a)(1)(c).

123.    Faderani attempts to conceal the fact that he is practicing pain management by advertising himself using concocted terms such as "'Interventionalist' Under Florida Board of Medicine Rule 64B8-11.001(8)(d)."   *See*   https://faderani.com/doctors-staff/ (last accessed December 1, 2025).

124.    "Interventionalist" is not nomenclature ordinarily used and the word does not actually appear in the Florida Board of Medicine Rule cited on the Atlas Medical website that makes this claim.

125.    Instead, the word "interventional" is used as part of titles that include "pain," as evidenced by the medical societies with which Faderani claims to be associated.

126.    Faderani claims to be a member of the American Society of Interventional Pain Physicians ("ASIPP") and claims to have attained "Diplomate" status of the American Board of Interventional Pain Physicians ("ABIPP").   *See* https://faderani.com/doctors-staff/ (last accessed December 1, 2025).

127.    The ASIPP explains that it was founded "to represent *interventional pain physicians* dedicated to improving the delivery of *interventional pain management* services . . . ." (emphasis added).

128.    The ABIPP advertises itself as promoting and advancing forms of interventional "pain management" and "treatment of pain related disorders."

129.    Faderani's advertisement of these claimed associations are necessarily advertisements that he renders pain management services.

130.    Faderani further holds himself out as having "received additional training at Harvard School of Medicine in the principles and practice of pain management," which is a further express advertisement of pain management medicine in violation of his permanent restrictions.

131.    Physicians who were employed by the defendants have also testified that Faderani practiced pain management, including Michael Olin, M.D. ("Olin"), who is listed on the Atlas Medical website and testified: "Well, Dr. Faderani does pain management[.]"

132.    The inclusion of the word "Orthopedics" in the title of defendant Atlas Medical appears to also be intended to obfuscate the actual nature of the practice, as Allstate has not been billed for a single orthopedic procedure by Atlas Medical during the entire period at issue in this Complaint.

133.    Although defendant Faderani purported to sign every record and bill for the patients at issue herein, some of the services claimed by Atlas Medical were actually performed, if at all, by a physician named Hachim Merheb, M.D. ("Merheb").

134.    Merheb advertises himself as a "Board-Certified Pain Expert," a "North Miami Beach Pain Management Physician," and an "experienced Interventional Pain Medicine specialist." *See* https://paincareflorida.com/north-miami-beach-pain-management/ (last accessed December 1, 2025).

135.    The Florida Health Care Clinic Act, FLA. STAT. § 400.990, *et seq.*, requires healthcare clinics to have a license to operate unless a specific statutory exemption applies.

136.    Atlas Medical never possessed a license during the period at issue in this Complaint and therefore all of its bills were "noncompensable and unenforceable" pursuant to FLA. STAT. § 400.9935(3) unless it qualified for a statutory exemption from the licensing requirement at the time it allegedly provided treatment or services.

137.    The defendants claim that Atlas Medical is exempt from licensure pursuant to FLA. STAT. § 400.9905(4)(g), which requires that the clinic be wholly physician owned and that "one of

the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws."

138.    As Faderani is the sole member of Atlas Medical, he is the only physician who could claim to supervise the activities of the practice.

139.    This exemption, however, cannot apply to Atlas Medical because it also requires that "a health care practitioner may not supervise services beyond the scope of the practitioner's license" and Faderani is prohibited from owning, operating, or working in a pain management practice.

140.    Faderani could not, for example, legally supervise the activities of pain management physician Merheb nor the hundreds of injections and other procedures at issue in this Complaint that constitute pain management services.

141.    That Atlas Medical was engaged in pain management is evidenced not just by its advertising in violation of the Florida Department of Health Order as described above, it is also evidenced by its own representations about the nature of the services claimed.

142.    For example, on January 20, 2022, Faderani reported that G.H. (Claim No. 0642463350) was a "candidate for interventional pain therapy" before going on to bill for the same predetermined treatment that was used for the vast majority of patients at issue herein.

143.    It is also clear that Faderani communicated (i.e., advertised) to other physicians and personal injury attorney referral sources that he performed pain management treatment.

144.    For example, on April 9, 2024, Faderani reported that D.N. (Claim No. 0747379063) "was subsequently referred to me to perform interventional pain therapy" before immediately billing for the exact same types of injections that were billed relative to the vast majority of patients at issue herein.

145.    This statement evidences both that it was communicated to the referral source that Faderani practiced pain management and that it was known that such pain management treatment is precisely what Faderani would do.

146.    In addition to all of this evidence that Faderani expressly and repeatedly advertised himself and Atlas Medical as providing pain management services, the fact that Atlas Medical is a pain management clinic is self-evident upon review of the charges it submitted.  *See* Exhibit 1.

147.    Atlas Medical billed for nothing except for pain management and alleged services ancillary thereto.  Id.

148.    Atlas Medical did not bill for any orthopedic services or procedures, did not order physical therapy or other holistic or conservative treatments, and did not provide long-term care or monitoring to patients.

149.    Atlas Medical simply obtained patient referrals for patients who needed to increase the perceived value of insurance claims and immediately billed for excessive and unnecessary pain management procedures that were unsupported and improper and were unlawful due to Faderani's permanent license restriction.

## VII.    UNLAWFUL AND FRAUDULENT BILLING

150.    The defendants' charges were also unlawful and non-compensable because nearly every bill for each claimed date of service included unbundled services in violation of FLA. STAT. § 627.736(5)(b)(1)(e).

151.    Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

152.    The defendants failed to meet this responsibility and instead submitted bills at unreasonable charges for medically unnecessary and excessive services and used fraudulent billing practices.

153.    The medical records, bills, and invoices submitted to Allstate by the defendants contained CPT and Healthcare Common Procedure Coding System ("HCPCS") codes.

154.    Providers such as the defendants are subject to the Health Insurance Portability and Accountability Act and are thus required to use CPT codes when submitting bills, in addition to being expressly required by statute to do so when submitting claims for insurance personal injury protection ("PIP") payment.

155.    By utilizing CPT and HCPCS codes to submit billing to Allstate, the defendants represented that the services they billed corresponded to and were accurately described by the descriptions for the CPT and HCPCS codes they utilized.

156.    The defendants never communicated to Allstate that they intended that the CPT and HCPCS codes they used to submit bills were intended to have any meanings other than those ascribed by the American Medical Association ("AMA") and the Centers for Medicare and Medicaid Services ("CMS"), which publish CPT and HCPCS codes, respectively.

157.    Allstate reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the defendants.

158.    Allstate reasonably relied on the defendants' utilization of CPT and HCPCS codes to accurately report the services they rendered to Allstate insureds and claimants.

A.   FRAUDULENT DOUBLE BILLING

159.   The expressly prohibited practice of unbundling constitutes double billing and is a common tactic used by unscrupulous providers to multiply the number and amount of charges submitted to insurers like Allstate.

160.   The defendants routinely manipulated CPT codes in contravention of the AMA's published guidance in order to bill Allstate multiple times for the same claimed procedures.

161.   As detailed below, the defendants' double billing was not simply a matter of inadvertent incorrect coding; it was a targeted method intentionally used by the defendants to induce Allstate to pay multiple times for the same purported services.

1.   Double Billed Supply Charges

162.   Atlas Medical routinely submitted separate and additional charges for ordinary supplies that were not separately billable (i.e., were unbundled) because they were already included in the cost of the procedures they billed.

163.   Atlas Medical regularly billed for items such as "surgical trays" and needles in conjunction with the routine pain management injections and procedures that constituted its predetermined treatment protocol.

164.   These types of supplies are not separately compensable unless their use was out of the ordinary for the procedure at issue and clearly documented as to why atypical supplies were necessary.

165.   Atlas Medical never made such documentation, and the supplies allegedly used were not atypical.

166.   Indeed, the supplies could not have been out of the ordinary from those typically required for the claimed procedures because Atlas Medical billed for them as a matter of course

and documented the claimed procedures with nearly identical copied and pasted records across all patients. *See* Exhibit 1.

167.   For the period at issue in this Complaint, Atlas Medical billed Allstate at least $880,909 through at least 1,245 individual charges for supplies such as needles and surgical trays that were unlawful and non-compensable because they were double billed/unbundled.

## 2.      Double Billed Components of Procedures

168.   When Atlas Medical billed for alleged pain management injections, including MBBs and ESIs, it unlawfully and fraudulently also included a separate and additional charge for purported imaging guidance using fluoroscopy.

169.   Fluoroscopic guidance and localization are an inclusive component of many injections and procedures, including ESIs and MBBs.

170.   Because fluoroscopy is considered an integral component of nearly all of the injections billed by Atlas Medical, the separate and additional charges submitted by Atlas Medical constitute double billing for the same purported service.

171.   For the period at issue in this Complaint, Atlas Medical billed Allstate at least $894,375 through at least 1,118 individual charges for fluoroscopic guidance that was unlawful and non-compensable.

## 3.      Improper Billing During Global Package Periods

172.   Another unlawful and fraudulent method of double billing is to bill separately and additionally for evaluations in conjunction with procedures, as it is obviously necessary to evaluate a patient prior to administering an invasive treatment.

173.     Billing guidelines for patients undergoing procedures such as injections establish a global "package" of components that are included in the charge amount for the procedure itself, including all services normally furnished before, during, and after a procedure.

174.     These guidelines apply in any setting, including inpatient hospitals, outpatient hospitals, ambulatory surgical centers, and physician's offices.

175.     The global package includes patient evaluations during a defined period of time before, on the day of, and after a procedure based on the type of procedure performed.

176.     Providers may not separately and additionally bill for the evaluation of a patient related to the procedure being performed if the evaluation occurs during the global period.

177.     Billing guidelines establish three global periods that apply to different types of procedures: a "zero-day" post-operative period for certain minor procedures, such as injections, that prohibits providers from billing for a separate patient evaluation on the day of the procedure; a "10-day" post-operative period for other procedures that prohibits providers from billing for a separate patient evaluation on the day of the procedure and for ten (10) days immediately following the date of the procedure; and a "90-day" post-operative period for major surgeries that prohibits providers from billing for separate patient evaluations one (1) day before the procedure, on the day of the procedure, and for ninety (90) days immediately following the date of the surgery.

178.     Atlas Medical routinely billed for evaluations within these global periods, including always billing for purported evaluations on the same date as administering MBBs and RFAs.

## VIII.   **FALSIFIED AND FABRICATED RECORDS**

179.     The defendants submitted altered, forged, and fabricated medical records in an effort to conceal their fraud and create the appearance of significant injury to support their charges submitted to Allstate for unnecessary services.

180.    As an initial matter, the defendants' records were copied and pasted between visits for the same patient and between different patients in ways that were material and that evidence that no serious evaluations or medical decision making was really being made.

181.    For example, nearly every time Atlas Medical billed for alleged RFAs it claimed that patients had experienced "approximately 80 percent relief" following MBBs.

182.    It is not possible that every patient at issue herein experienced the exact same degree of pain relief following these injections, and it is clear that this statement was simply copied and pasted into the medical records to create the appearance of justification for performing RFAs.

183.    That Atlas Medical's records were copied and pasted is also evidenced by repeated typographical errors, such as incorrectly referring to medial branch blocks as "median" branch blocks and using identical statements across records for numerous different patients.

184.    The defendants also copied completely irrelevant purported evaluation findings into records to make it appear that alleged evaluations were more complex than they actually were.

185.    For example, even when patients complained of just spinal pain, Atlas Medical often generated multi-page records purporting to evaluate pain in various extremities and other body systems to create the appearance that evaluations were more complex than they were and that patients were more injured than they were.

186.    The defendants also falsified patient diagnoses to create the appearance that injections and procedures for which they billed were medically proper.

187.    For example, on April 9, 2024, Atlas Medical made detailed claims purporting that D.N. (Claim No. 0747379063) had undergone a lumbar MRI that supported the performance of ESIs.

188.    In fact, D.N. had not undergone lumbar MRIs at all, because D.N. had not previously claimed that he injured his lumbar spine despite undergoing a lengthy course of chiropractic treatment.

189.    Similarly, the very next day, April 10, 2024, R.P. (Claim No. 0736182833) presented to Atlas Medical with complaints of "muscle tightness and throbbing and shoots to the shoulders" and Faderani claimed that the patient had disc bulges at the "C4/5,C5/6" regions based on review of MRI results.

190.    This diagnosis was necessarily false as R.P. had not actually undergone an MRI of his cervical spine.

191.    The defendants also exaggerated and fabricated patients' reported pain in order to create the appearance that ongoing treatment was appropriate.

192.    For example, on May 16, 2024, Atlas Medical claimed that A.M. (Claim No. 0751954512) was experiencing pain rated at 8/10 on the pain scale when A.M. had consistently reported far lower pain scores to his chiropractor over a lengthy course of treatment, including pain at just 5/10 shortly before the purported Atlas Medical evaluation and 3/10 shortly after.

193.    Atlas Medical also failed to note the radicular component of A.M.'s claimed pain that had been clearly reported to the chiropractor.

194.    The injections most frequently billed as part of Atlas Medical's predetermined treatment protocol – MBBs – are only indicated if a patient presents with axial, non-radiating pain. If a patient has radiculopathy, MBBs are contraindicated.

195.    Instead of accurately characterizing A.M.'s pain, Atlas Medical ignored the radicular component to create the appearance that MBBs would be appropriate, which it billed that same day.

196.   A.M. then reported to his chiropractor that his pain was a barely perceptible 1/10 in his neck and mid back and 2/10 in his lumbar spine throughout early June 2024.

197.   Despite this, when A.M. allegedly returned to Atlas Medical on June 20, 2024, it was claimed that relief from chiropractic treatment had been only temporary (in reality, pain levels had steadily decreased and maintained low levels) and used that claim as a (false) justification to bill for RFAs that had no proper basis.

198.   Similarly, M.R. (Claim No. 0751821349) was allegedly evaluated by Atlas Medical on June 20, 2024 and claimed to have "throbbing" pain rated at 9/10 on the pain scale.

199.   Just two (2) days prior, M.R.'s chiropractor, who had seen her on a serial basis for weeks, described her pain as "moderate" and "intermittent," which certainly does not constitute the unbearable throbbing pain claimed by Atlas Medical.

200.   The defendants also fabricated patients' supposed responses to treatments in order to create the appearance that repeated and additional procedures were medically necessary and appropriate.

201.   For example, Atlas Medical billed for alleged administration of six (6) levels of MBBs to E.S. (Claim No. 0751587767) on June 5, 2024 and claimed that he had pain rated at 8/10 on the pain scale on that date.

202.   The following day, June 6, 2024, on which any relief from the MBBs would have been felt, E.S. reported to his chiropractor that his pain was unchanged with scores of 6/10 in his cervical spine and 7/10 in his lumbar spine and did not mention having undergone injections the prior day.

203.     Less than a week later, on June 12, 2024, Atlas Medical falsely claimed that E.S. had achieved 80% relief from the MBBs in order to create the appearance that billing for RFAs, which it did that day, would be medically proper.

204.     All of the types of fabricated, exaggerated, and falsified records addressed herein were intended to create the appearance of severity of injury and necessity of treatment and were intentionally used by the defendants and their associates to induce Allstate to make payment for alleged treatments that were not performed, were unlawful, were excessive, and were medically unnecessary, and Allstate is entitled to a return of all money paid as a result of such fabricated records.

## IX.     UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT

205.     The defendants' willingness to bill for services not rendered and unlawfully rendered and to fabricate records demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

206.     The defendants' goal was to bill as much as possible, regardless of whether treatment was reasonably necessary to patients' care, recovery, or rehabilitation, in order to generate bills for submission to Allstate.

207.     To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment and testing, as discussed more fully below.

208.     The defendants' purported treatment violated standards of care in the medical community, as the vast majority of testing, referrals, procedures, and treatment were not medically indicated, and were redundant, excessive, and repeated without any benefit to patients.

209.    The unnecessary treatment billed by the defendants, discussed herein, includes the treatment and patients set out in the chart annexed hereto at Exhibit 1.

210.    All of the bills submitted by the defendants seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

211.    Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money it was induced to pay as a result of the defendants' fraud.

212.    None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate.

A.    **THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL**

213.    Each of the defendants' patients was assessed as having extremely similar reports of complaints and purported findings regardless of the type of accident claimed and regardless of each patient's age, sex, alleged injury, accident facts, co-morbidities, and pre-accident condition.

214.    These predetermined and boilerplate assessments were used to justify the nearly universal immediate resort to invasive injections billed by the defendants.

215.    Patients at issue herein were often referred to Atlas Medical for the express purpose of undergoing pain management injections despite the fact that Faderani is barred from practicing pain management.

216.    For example, Faderani reported that D.N. (Claim No. 0747379063) "was subsequently referred to me to perform interventional pain therapy" on April 9, 2023, evidencing that it was already established before the patient even presented to the clinic that invasive pain management procedures would be billed.

217.    Atlas Medical rubber stamped these referrals without any serious examination and immediately billed for injections to the vast majority of patients.

218.    Atlas Medical rarely obtained even a basic patient medical history and did not assess whether patients had comorbidities that would contraindicate steroid injections, such as diabetes or heart conditions.

219.    The failure to conduct even rudimentary reviews of medical histories was particularly egregious in the case of elderly patients, who were statistically likely to have relevant comorbidities that were not assessed at all.

220.    For example, M.R. (age 74) and J.E. (age 76) (Claim No. 0751821349) each allegedly presented to Atlas Medical on June 20, 2024.

221.    Atlas Medical did not obtain medical histories (including no information about medications, comorbidities, or prior treatment) from either M.R. or J.E.

222.    Despite having virtually no information about M.R.'s and J.E.'s clinical pictures, Atlas Medical immediately billed for allegedly administering multi-level MBBs to both of them.

223.    Nearly identical improper treatments were also billed for patients of vastly different ages.

224.    For example, on July 23, 2024, Atlas Medical billed for alleged multi-level MBBs to M.F. (Claim No. 0751777483) despite the fact that M.F. was just seventeen (17) years old at the time and had reported decreasing pain scores to his chiropractor that were just 2/10 by the second half of June.

225.    In many cases, Atlas Medical did not document performing a physical examination at all and instead claimed to perform only a "general examination" that was limited to assessing for pain on palpation before administering injections.

226.    For example, on August 12, 2024, Atlas Medical billed for allegedly administering MBBs to J.R.'s (Claim No. 0753692052) cervical spine despite claiming to perform just a "general examination" that did not include evaluation of range of motion, any orthopedic or neurologic tests, obtaining a patient medical history, or reviewing prior imaging.

227.    Indeed, it is unclear how Merheb, who claimed to perform this procedure despite the record and bill being signed by Faderani, was able to select what spinal levels to inject as the only supposed finding was "tenderness" at the patient's C2 to T1 levels, which constitutes nearly the entire cervical spine.

228.    In some cases, injections were recommended even without an understanding of claimed injuries.

229.    For example, on July 11, 2024, Atlas Medical billed for an alleged high-level complex evaluation of F.C. (Claim No. 0753839042) and did not record the date that the patient claimed to have been injured but nevertheless immediately recommended that he undergo MBBs.

230.    Further, F.C., who was just twenty-four (24) years old at the time, was reported to have normal range of motion in all relevant planes of movement and a negative Kemp test, which is a test designed to diagnose the type of facetogenic pain targeted by MBBs.

231.    Atlas Medical was unsuccessful at convincing F.C. to undergo these unnecessary and improper injections, but nevertheless reported it would charge $4,500 for the procedure in its record in order to still allow the personal injury attorney to claim the amount as damages from Allstate – an amount of damages that Atlas Medical was directly responsible for causing through its false claim that F.C. needed such treatment.

232.    Atlas Medical also recommended and billed for the same injections without reviewing or understanding what prior treatment had been rendered and whether it was efficacious.

233.     For example, on April 9, 2024, Atlas Medical billed for three (3) levels of alleged lumbar ESIs to D.N. (Claim No. 0747379063) based on a claim that D.N.'s pain had not responded to chiropractic care.

234.     In fact, although D.N. had undergone a course of chiropractic treatment, he had not reported any pain to his lumbar spine (apart from general soreness that was noted just twice over the entire course of treatment) and therefore he had not undergone any chiropractic treatment to his lumbar spine.

235.     Atlas Medical nevertheless proceeded to bill for incredibly aggressive injections based on its lack of understanding that D.N. had not even first attempted conservative therapy to the relevant spinal area.

236.     Similarly, on June 19, 2024, Atlas Medical billed for both an initial evaluation and multiple levels of MBBs to R.M. (Claim No. 0753151547) despite performing just a "general examination" that consisted primarily of palpating the patient's spine.

237.     Atlas Medical claimed that prior physical therapy to R.M. had achieved some benefit, but made no inquiry as to what modalities had led to relief and did not review any of the records of such therapy.

238.     That the defendants utilized a predetermined protocol that had nothing to do with legitimate patient care is also evidenced by the fact that there were almost never follow-up appointments to evaluate how patients responded to RFAs.

239.     Instead, after patients agreed to undergo MBBs and then RFAs, they were simply not contacted again by Atlas Medical.

240.     All of these examples illustrate how Atlas Medical's predetermined treatment protocol was to immediately order and bill for injections and other pain management procedures

regardless of patients' actual presentations and medical needs and resulted in millions of dollars of treatment billed to Allstate that was inappropriate and medically unnecessary, as set forth further below.

### B.   MEDICALLY UNNECESSARY INJECTIONS

241.   The defendants routinely billed Allstate for injections that were medically unnecessary, if they were performed at all.

242.   The performance of invasive procedures, including injections, must be based upon adequate diagnosis and legitimate medical necessity.

243.   As discussed above, the vast majority of patients at issue herein were subjected to invasive injections at their very first appointments with the defendants on a predetermined basis and with no consideration given to any other forms of treatment.

244.   In many cases, these predetermined injections were billed shortly after claimed motor vehicle accidents and without any attempt at conservative care, which violates standards of care.

245.   For example, Atlas Medical billed for alleged MBBs to A.H. (Claim No. 0754516425) on June 4, 2024, less than one (1) month after a claimed motor vehicle accident on May 10, 2024.

246.   On the same date, A.H. presented to a separate provider for an evaluation and was referred to start physical therapy, which confirms that no such therapy was attempted before Atlas Medical unnecessarily billed for multiple injections.

247.   As detailed above, examinations billed by the defendants, if they were performed at all, resulted only in boilerplate findings (often fabricated and exaggerated) and predetermined treatment plans that were not adequate to support the performance of invasive procedures.

35

248.     Consequently, patients received unjustified invasive procedures that offered little therapeutic or diagnostic efficacy while subjecting the patients to unnecessary risks of infection.

249.     Of the 745 patients at issue in this Complaint, the defendants billed Allstate for allegedly injecting 636 of them, a rate of 85%.  *See* Exhibit 1.

250.     ESIs are indicated when a patient complains of radicular pain (which must be confirmed through a proper neurologic evaluation and testing) and are both diagnostic and therapeutic, in that if a patient experiences a sufficient level of pain relief for an appropriate period, the injected disc space is determined to be the possible source of the patient's pain and further treatment, including additional ESIs, may be appropriate.

251.     Facet blocks are indicated when a patient complains primarily of axial, non-radiating spinal pain and involve injecting anesthetic near medial branch nerves that feed out from facet joints and are intended to be diagnostic, in that if a patient experiences a sufficient level of short-term pain relief for an appropriate period of time then the facet joint is determined to be the possible source of the patient's pain, indicating the patient is a candidate for other therapeutic treatments such as a RFA.

252.     The defendants regularly billed for ESIs and facet blocks that were inappropriate and contraindicated based on patients' actual complaints and the defendants' own supposed examination findings.

253.     For example, on October 8, 2021, Atlas Medical billed for multi-level MBBs to J.S. (Claim No. 0621808781) despite the patient reporting that "pain shoots to both legs at times," which means the pain was radicular and not axial so MBBs were not indicated.

254.     In another example, O.L. (Claim No. 0671956464) reported to both a chiropractor and orthopedic surgeon that his pain radiated to the right shoulder and hand.

255.    Just weeks after these representations, O.L. presented to Atlas Medical on July 28, 2022 and was immediately subjected to multi-level MBBs despite this clear evidence that he had radicular symptoms.

256.    The defendants also billed for injections even when there was clear evidence that patients were responding to conservative care.

257.    For example, S.O. (Claim No. 0635463631) reported that physical therapy had been helping alleviate his pain complaints.

258.    Atlas Medical nevertheless immediately billed for ESIs upon S.O.'s presentation to the clinic on November 11, 2021.

259.    The defendants also did not attempt to pinpoint the source of patients' pain and instead utilized a shotgun smattering approach by almost exclusively billing for multiple levels based on cursory examinations that were often limited to simply palpating a patient's spine.

260.    For example, Y.S. (Claim No. 0621509223) presented to Atlas Medical on July 20, 2021 with complaints of "muscle tightness and throbbing and shoots to the hips."

261.    Despite express radiating symptoms, Atlas Medical immediately billed for six (6) levels of MBBs (even though only four (4) were actually done, if any were done at all) "at the right C4, C5, C6 as well as L4, L5, S1 levels."

262.    Three days later on July 23, 2021, Y.S. returned to the defendants where Faderani claimed the patient had "cervical tenderness is most prominent at the right C4-C7 level and L3-S1 regions."

263.    Despite changing the spinal levels at which the patient allegedly experienced pain and a failure to determine if the diagnostic MBBs had been successful, Atlas Medical proceeded to bill for RFAs.

264.     When the patient returned following the RFAs and still had radicular pain – which of course was not targeted and could not have been expected to be addressed by the MBBs and RFAs – Atlas Medical changed course entirely and billed for ESIs followed by an alleged percutaneous discectomy.

265.     The treatments billed relative to Y.S. were not unique, they were not targeted to actual pain complaints and symptoms, and they were done (if at all) simply to generate tens of thousands of dollars in charges as quickly as possible.

### C.     MEDICALLY UNNECESSARY PROCEDURES

266.     The defendants' clear goal was to convince patients to undergo – or create the appearance that they would undergo – the most expensive treatments possible in order to drive up the perceived value of insurance claims.

267.     Radiofrequency ablations ("RFAs") involve cauterizing nerves in facet joints to address facetogenic (as opposed to discogenic) axial (as opposed to radicular) pain, and standard practice is to use these procedures only after facetogenic pain is confirmed through the performance of MBBs.

268.     The defendants disregarded this standard of care by billing for radiofrequency ablations even when they diagnosed discogenic and radicular pain (rather than axial facetogenic pain).

269.     For example, F.C. (Claim No. 0697950350) was allegedly evaluated at Atlas Medical on June 23, 2023 and was immediately subjected to MBBs despite a report of a "shooting component" of the pain.

270.    On July 7, 2023, F.C. returned to the clinic and despite no analysis of whether the MBBs had been successful (and therefore suggested that the patient's pain was facetogenic instead of radicular), Faderani recommended and Atlas Medical billed Allstate for RFAs.

271.    On July 18, 2023, F.C. again returned, at which point it was acknowledged that "[t]here is a radiculopathic nature of the low back pain to the right thigh," so Faderani changed course and recommended and the defendants billed Allstate for ESIs at this visit and claimed without waiting to see the results that "the patient is a surgical candidate . . . for a partial discectomy" and "the cost of this procedure is approximately 59,000 excluding the surgery center fees and anesthesiology."

272.    In another example, S.H. (Claim Nos. 0697955201) was allegedly evaluated at Atlas Medical on April 20, 2023 with an apparent "shooting competent" indicative of radicular pain.

273.    Despite this, Faderani recommended and the defendants billed Allstate for MBBs at this first visit.

274.    Even when patients were claimed to have solely axial pain, the defendants' protocol of billing for RFAs as a matter of course resulted in the performance of procedures that were medically unsupported and unnecessary.

275.    As discussed above, the only supposed justification for subjecting patients to RFAs was limited palpation of the spinal area after the RFAs had already been scheduled.

276.    Because the defendants copied and pasted their records between patients and fabricated results of procedures, nearly every patient was claimed to have nearly identical pain on palpation prior to RFAs as they reported prior to MBBs, evidencing that the MBBs had not actually afforded any relief.

277.   For example, on July 11, 2024, Atlas Medical billed for six (6) MBBs (even though at most just four (4) were actually done) to J.M. (Claim No. 0752334508) based on a "general examination" that found pain to palpation.

278.   On July 25, 2024, Atlas Medical billed for six (6) RFAs (again, at most four (4) were actually performed) to the same spinal levels based on a "focused examination" that found nothing more than essentially the same pain on palpation that was reported prior to the MBBs, showing that J.M.'s condition had not changed.

279.   Proceeding to bill tens of thousands of dollars per patient in the absence of any valid evidence that diagnostic procedures such as MBBs had been successful is unreasonable, contrary to established medical guidelines and standards of care, and non-compensable.

## X.   **HARM TO PATIENTS**

280.   The defendants' unnecessary and unlawful treatment, as detailed above, and fraudulent billing practices, also detailed above, injured Allstate in its business and property because Allstate was billed for the bogus and unlawful alleged treatment and Allstate tendered payment to the defendants that it would not have paid had the defendants provided true and accurate information about their conduct.

281.   The defendants' alleged treatment and billing practices also harmed patients, who were consumers that were subjected to unnecessary treatment just so the defendants could inflate insurance claims submitted to Allstate for payment.

282.   Patients not being informed of the facts concerning the (lack of) lawfulness, and (lack of) reasonableness, of their treatment was harmful to patients, as the patients were deprived of the ability to make fully-informed decisions about their medical care and risked medical treatment that was not properly determined.

283.     The defendants' patients were also harmed by paying deductibles and copayments to the defendants (*see* FLA. STAT. § 817.234(7)(a)) for unlawful and unnecessary treatment.

284.     Finally, patients were harmed by allowing their PIP benefits (which are capped at a maximum of $10,000 under Florida law) to be used up by the defendants (whose alleged treatment was unlawful and unnecessary) instead of applying the available PIP benefits to legitimate treatment.

## XI.     MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE

### A.     MISREPRESENTATION BY THE DEFENDANTS

285.     To induce Allstate to promptly pay their claims that were propped up by their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and billed were necessary, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

286.     Every time the defendants submitted bills and medical records to Allstate supporting their claims for insurance benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

287.     There are no less than six (6) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

> a.   The defendants routinely billed for services that were not performed at all.
>
> b.   The defendants unlawfully billed for services without valid licensure and in violation of permanent restrictions instituted by the Florida Board of Health as a result of similar past misconduct by defendant Faderani.

c.  The defendants unlawfully double billed/unbundled for claimed services, including supplies, imaging guidance, and evaluations.

d.  The defendants fabricated, falsified, forged, and otherwise exaggerated records submitted to Allstate to create the appearance of injury and propriety of treatment and inflate the perceived value of insurance claims.

e.  The defendants used an improper predetermined treatment protocol to immediately bill for excessive injections and procedures.

f.  The defendants ordered and pressured patients to undergo injections and procedures that were medically unnecessary and ordered in violation of applicable standards of care.

288.  As detailed *supra*, the defendants frequently violated standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

289.  The foregoing facts – including billing for services not rendered, unlawfully billing for treatment, falsifying medical records, using a predetermined treatment protocol to inflate charges, misrepresenting the necessity of treatment, and billing multiple times for the same purported services – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

290.  The prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and related services by the defendants unnecessary and unlawful (to the extent actually rendered at all).

291.  The fact of improper and unnecessary treatment and billing is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the chart annexed at Exhibit 1.

292.  Thus, each claim for payment (and accompanying medical records) mailed, faxed, and emailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a

misrepresentation because the treatment underlying the claim was not lawful, not reasonable, and not medically necessary.

293.    Through the submission of patient records, invoices, bills, and other medical documentation to Allstate via the U.S. Mail, fax, and email, the defendants attested to the fact, lawfulness, and medical necessity of the examinations, services, and procedures for which they billed Allstate.

294.    As the defendants did not render lawful and reasonably necessary medical treatment and services, and misrepresented the treatment and services purportedly performed, each bill and accompanying documentation mailed, faxed, and emailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

       **B.**    **ALLSTATE'S JUSTIFIABLE RELIANCE**

295.    The documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

296.    At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of treatment and services allegedly provided by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under Florida and federal law.

297.    These misrepresentations include submitting false medical documentation, including bills, documenting the fact, lawfulness, and necessity of medical treatment and services.

298.    Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

299.     Due to the defendants' material misrepresentations and affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

300.     In reliance on and as a result of the defendants' misrepresentations, Allstate paid money to the defendants and as a result of the bills generated and submitted by and on behalf of the defendants to its detriment.

301.     Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the medical treatment and services billed.

## XII.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

302.     As detailed above, the treatment and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed, if performed at all.

303.     The objective of the scheme to defraud Allstate, which occurred throughout the period set out in Exhibit 1, was to collect insurance payments under Florida law and Allstate policies of insurance, including inducing Allstate to make payments from which the defendants received a financial benefit in response to insurance claims that were propped up by the defendants' bills for medical services that were not rendered, were not necessary, were not lawfully rendered, and were fraudulently billed.

304.     This objective necessarily required the submission of bills for payment to Allstate.

305.     The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent faxes and emails over interstate wires.

306.     Documents, medical records, notes, reports, bills, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail or over interstate wires.

307.     All medical records and bills submitted through interstate wires by the defendants were faxed and emailed from the defendants in Florida to Allstate in Illinois and Ohio.

308.     Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payments.

309.     Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via check mailed by Allstate using the U.S. Mail.

310.     It was foreseeable to the defendants that submitting bills to personal injury attorneys would trigger mailings, faxes, and emails in furtherance of the scheme to defraud, including demands for payment mailed, faxed, or emailed to Allstate.

311.     It was foreseeable to the defendants that submitting bills to Allstate, both directly and indirectly through their patients' personal injury attorneys, would trigger mailings, faxes, and emails in furtherance of the scheme, including payment of fraudulent bills via checks mailed by Allstate.

312.     The fraudulent medical billing scheme detailed herein generated hundreds of mailings, faxes, and emails.

313.     A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 2.

314.     As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via interstate wires and the U.S. Mail related to each exemplar patient discussed in this Complaint.

315.     It was within the ordinary course of business for the defendants, and the personal injury attorneys with whom they associated, to submit claims for payment and demands to insurance carriers like Allstate through interstate wires and the U.S. Mail.

316.     Moreover, the business of billing for medical treatment and services by the defendants at issue herein is regularly conducted by fraudulently seeking payment to which each defendant is not entitled through the use of fraudulent communications sent via interstate wires and the U.S. Mail.

317.     In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for the defendants.

318.     The defendants continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

319.     Thus, the defendants' commission of mail and wire fraud continues.

320.     As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that were misrepresented and not compensable, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

321.     As all of the defendants named herein agreed that they would use (and, in fact, did use) faxes and emails over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable and lawful, these defendants committed wire fraud as defined in 18 U.S.C. § 1343.

322.    Allstate reasonably relied on the submissions it received from the defendants, including the representative submissions set out in Exhibit 1 annexed hereto and identified in the representative patient claims above.

323.    As the defendants agreed to pursue the same criminal objective (namely, mail fraud and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII.   **DAMAGES**

324.    The wrongful conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

325.    Allstate's claim for compensatory damages includes (a) payments made by Allstate directly to Atlas Medical and Faderani PA (for the benefit and receipt of all of the defendants) in reliance upon and as a result of the defendants' false representations regarding the fact, lawfulness, and necessity of the treatment for which they directly billed Allstate; and (b) payments made by Allstate to the defendants' patients (from which the defendants also received payment) that were based on the fraudulent, misrepresentation-laden bills and records from the defendants.

326.    Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate has been induced to pay millions of dollars to and for the benefit of the defendants to resolve insurance claims that were falsely and unlawfully inflated by the fraudulent submissions detailed above.

327.    Allstate's damages seek monies paid directly to the defendants or on their behalf by Allstate, and the damages are not derivative of an injury to any other person or entity.  The patients at issue in this Complaint were used as pawns by the defendants and have been victimized by the defendants.  However, the actual target of the defendants' scheme – and the sole party who

received fraudulent mailings, faxes, and emails as itemized in the exemplar patients above and in Exhibits 1 and 2 – is Allstate.  Allstate alone paid the damages at issue herein.  Injury to Allstate was also the reasonably probable consequence of the defendants' actions, as it was in the ordinary course of the defendants' business to collect insurance proceeds.

328.    The defendants' wrongful conduct discussed above caused Allstate to incur damages by paying claims that otherwise would not have been paid but for the defendants' misrepresentations and improper conduct (as set out in the preceding sections).  Allstate was the target of the defendants' conduct and bills, and Allstate's damages are directly related to and a consequence of the defendants' actions discussed herein.

329.    Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed, faxed, and emailed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

330.    Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

**XIV.    CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Atlas Medical Enterprise)**
**Against Dr. Rahat Faderani, DO, MPH, PA and M. Rahat Faderani, D.O.**

331.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 330 set forth above as if fully set forth herein.

332.    Atlas Medical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

333.    In connection with each of the claims identified in the within Complaint, defendants Faderani PA and Faderani ("Count I defendants") intentionally caused to be prepared and mailed/faxed/emailed false medical documentation by or on behalf of Atlas Medical, or knew that such false medical documentation would be mailed/faxed/emailed in the ordinary course of Atlas Medical's business, or should have reasonably foreseen that the mailing/faxing/emailing of such false medical documentation by or on behalf of Atlas Medical would occur, in furtherance of the Count I defendants' scheme to defraud.

334.    The Count I defendants knew or should have foreseen that two (2) or more mailings/faxes/emails would be sent to demand and receive payment from Allstate on certain dates, including those mailings/faxes/emails identified in the chart annexed hereto at Exhibit 2.

335.    As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Atlas Medical, which they knew would be billed by Atlas Medical and submitted to Allstate by Atlas Medical in order to collect payment from Allstate.

336.    Faderani owned, operated, and conducted Atlas Medical and was responsible for all actions taken by Atlas Medical and its representatives.

337.    Faderani PA operated interchangeably with Atlas Medical, submitted bills using the Atlas Medical name, and shared all physical locations, staff, and systems with Atlas Medical for the period at issue herein.

338.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Atlas Medical for the benefit of the Count I defendants that would not otherwise have been paid.

339.     The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

340.     By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Atlas Medical Enterprise)
### Against Dr. Rahat Faderani, DO, MPH, PA and M. Rahat Faderani, D.O.

341.     Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 330 set forth above as if fully set forth herein.

342.     Defendants Faderani PA and Faderani ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Atlas Medical.

343.     The Count II defendants each agreed to further, facilitate, support, and operate the Atlas Medical enterprise.

344.     As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

345.     The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Atlas Medical even though Atlas Medical was not eligible to collect such payments by virtue of its unlawful conduct.

346.     The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

347.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

348.     By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(FLA. STAT. §§ 501.201-501.213)**
**Against All Defendants**

349.     Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 330 set forth above as if fully set forth herein.

350.     Defendants Atlas Medical, Faderani PA, and Faderani ("Count III defendants") engaged in unfair and deceptive acts and practices in the conduct of trade and commerce in violation of FDUTPA in relation to each insurance claim at issue herein.  *See* FLA. STAT. §§ 501.201-501.213.

351.     The Count III defendants' deceptive acts and practices included knowingly billing for services that were unlawful and non-compensable, including due to permanent restrictions on defendant Faderani's medical license and unbundling in violation of Florida statutory law, all of which constitute false, incomplete, and misleading statements.

352.     The Count III defendants' deceptive acts and practices injured Allstate in its business and property because Allstate paid money and insurance benefits in response to bills and

medical records submitted by the Count III defendants that were improper for the reasons set out in this Complaint.

353.   The Count III defendants' deceptive acts and practices also harmed patients, who were not given truthful information to make their own healthcare decisions.

354.   Knowingly causing to be presented to any insurer a false claim for payment is expressly an unfair or deceptive act or practice pursuant to FLA. STAT. § 626.9541(1)(u).

355.   The defendants' violations of FLA. STAT. § 817.234, FLA. STAT. § 626.9541, and FLA. STAT. § 627.736(5)(b)(1) are *per se* violations of the FDUTPA.

356.   Accordingly, the defendants' conduct is *per se* unfair or deceptive under FDUTPA. *See* FLA. STAT. § 501.204(1).

357.   The defendants' above-described conduct was deceptive as it was likely to, and did in fact, mislead the defendants' patients and Allstate, while acting reasonably under the circumstances, to Allstate's detriment by misrepresenting the fact, lawfulness, and medical necessity of the charges.

358.   The defendants' above-described conduct was unfair as it was contrary to public policy, unconscionable, immoral, unethical, oppressive, and unscrupulous, and produced no benefits to consumers or competition and in fact harmed the defendants' patients.

359.   As a result of the defendants' deceptive and unfair practices, patients were harmed and Allstate has been injured in its business and property and the defendants are liable to Allstate for damages and an award of attorney's fees pursuant to FLA. STAT. § 501.2105(1).

## COUNT IV
## COMMON LAW FRAUD
### Against All Defendants

360.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 330 set forth above as if fully set forth herein.

361.    The scheme to defraud perpetrated by Atlas Medical, Faderani PA, and Faderani ("Count IV defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were actually and lawfully rendering medically necessary treatment and services and were entitled to collect payments from Allstate.

362.    The misrepresentations of fact made by the Count IV defendants include, but are not limited to, those material misrepresentations discussed in section XI.A, *supra*.

363.    The Count IV defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

364.    The misrepresentations were intentionally made by the Count IV defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable insurance claims for payment would be submitted to Allstate.

365.    The Count IV defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under federal and Florida law.

366.    Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and incurring expenses related to the adjustment and processing of claims submitted by and on behalf of the defendants.

367.     As a direct and proximate result of the defendants' representations and acts, Allstate has been damaged in its business and property as previously described herein.

## COUNT V
## CIVIL CONSPIRACY
**Against All Defendants**

368.     Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 330 set forth above as if fully set forth herein.

369.     Defendants Atlas Medical, Faderani PA, and Faderani ("Count V defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment to which they were not entitled because (1) the defendants did not actually render the treatment for which insurance claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices, as described above.

370.     The Count V defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

371.     This purpose was known to all of the Count V defendants and intentionally pursued.

372.     Despite knowing that the defendants were not entitled to payment because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count V defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

373.     In reasonable reliance on and as a result of the false medical documentation submitted by the defendants, Allstate paid certain of the insurance claims submitted.

374.     All of the Count V defendants directly benefited from the payments made to Atlas Medical.

375.     All of the Count V defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count V defendants in the commission of acts done for the benefit of all Count V defendants and to the unjustified detriment of Allstate.

376.     Accordingly, all of the Count V defendants are equally liable for the fraud perpetrated on Allstate by each other defendant pursuant to their conspiracy.

**COUNT VI**
**UNJUST ENRICHMENT**
**Against All Defendants**

377.     Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 330 set forth above as if fully set forth herein.

378.     Defendants Atlas Medical, Faderani PA, and Faderani ("Count VI defendants") submitted, caused to be submitted, or benefited from insurance claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' misrepresentations.

379.     Allstate's payments constitute a benefit that the Count VI defendants aggressively sought and voluntarily accepted.

380.     The Count VI defendants wrongfully obtained or benefited from payments from Allstate through the scheme detailed herein.

381.     The Count VI defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

<u>COUNT VII</u>
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against All Defendants**

382.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 330 set forth above as if fully set forth herein.

383.    Defendants Atlas Medical, Faderani DO. and Faderani ("Count VII defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

384.    The Count VII defendants also billed for services not rendered.

385.    The Count VII defendants also billed for services pursuant to a scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating insurance claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

386.    Pursuant to Florida law, Allstate is liable to pay PIP benefits only for "reasonable expenses for medically necessary medical, surgical, x-ray, dental, and rehabilitative services related to injuries caused by motor vehicle accidents up to the applicable cap of either $2,500 or $10,000," FLA. STAT. § 627.736(1)(a), and to pay other claims only for reasonably necessary, causally related, and lawful services.

387.    Where a claimant and/or assignee is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of an accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

388.    The Count VII defendants continue to submit and cause to be submitted claims for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

389.    The Count VII defendants will continue to submit and cause to be submitted claims to Allstate absent a declaration by this Court that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by any of the Count VII defendants.

390.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants billed for unnecessary and unlawful treatment that is not compensable.

391.    Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants were engaged in a scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

392.    As such, the Count VII defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants cannot seek payment from Allstate for benefits under any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint.

393.    Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint.

## XV.    DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate North American Insurance Company respectfully pray that judgment enter in their favor as follows:

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Atlas Medical Enterprise)
### Against Dr. Rahat Faderani, DO, MPH, PA and M. Rahat Faderani, D.O.

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

### COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Atlas Medical Enterprise)
### Against Dr. Rahat Faderani, DO, MPH, PA and M. Rahat Faderani, D.O.

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (FLA. STAT. §§ 501.201-501.213)
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate all damages pursuant to FLA. STAT. §§ 501.201-501.213, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the deceptive and unfair conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
### COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT V
### CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

**COUNT VI**
**UNJUST ENRICHMENT**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

**COUNT VII**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against All Defendants**

(a)     DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Atlas Medical & Orthopedics, LLC; Dr. Rahat Faderani, DO, MPH, PA; and M. Rahat Faderani, D.O., jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Atlas Medical & Orthopedics, LLC; Dr. Rahat Faderani, DO, MPH, PA; and M. Rahat Faderani, D.O., jointly and severally, cannot seek payment from Allstate pursuant to any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint;

(c)     DECLARE that Atlas Medical & Orthopedics, LLC; Dr. Rahat Faderani, DO, MPH, PA; and M. Rahat Faderani, D.O., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy and/or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under federal law, Florida law, and the principles of equity.

60

## XVI.   <u>**DEMAND FOR JURY TRIAL**</u>

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted,

*/s/ Andrew H. DeNinno*

_____
Andrew H. DeNinno (FBN 1061324)
adeninno@ktmpc.com
KTM
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214 (phone)
*LEAD COUNSEL*

Dated: December 2, 2025                    *Attorneys for Plaintiffs*